**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:04cr00204** |
| | ) | |
| **THOMAS STERLING FARMER, JR.,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Defendant Thomas Sterling Farmer, Jr. has been indicted for conspiring to manufacture, distribute and possess methamphetamine, knowingly manufacturing methamphetamine within one thousand feet of a school, and unlawfully possessing equipment and materials with the intent to manufacture methamphetamine.  (Indictment, Doc. No. 1.)  A warrantless search of Defendant's home was conducted on the evening of November 22, 2003.  Among the items discovered and seized from his home during that search were miscellaneous drug paraphernalia and the key to an outbuilding located on the farm adjacent to his home, in which a suspected methamphetamine lab was located. Defendant has filed a motion (Doc. No. 42) to suppress any statements made by him and any items seized from his home that night on the basis that the entry into his house and the search were conducted without valid consent or a warrant.  For the reasons set forth below, the Court will GRANT Defendant's motion.

**I.      THE HEARING ON THE MOTION TO SUPPRESS**

The following summarizes the testimony obtained during the December 15, 2005 hearing on Defendant's Motion To Suppress (see 12/15/2005 Transcript Of Suppression Hearing ("Transcript"), Doc. No. 51).

**A.      Testimony of Thomas Farmer, Sr.**

Defendant's uncle, Thomas Farmer, Sr. ("Mr. Farmer"), testified that, at the time of the search of Defendant's home, Mr. Farmer owned an interest in some farmland located at the intersection of Highway 99 and Warrior Drive in Rutherford County, Tennessee.  Mr. Farmer and his brother had inherited the property, but his brother had previously died and left his share to his wife and two sons.  One of those sons

is the Defendant in this matter.

The two families own jointly a parcel of farm property. In addition, each family owns separately several acres upon which their respective homes were built. At the time the search was conducted, Defendant lived in a log house on land owned exclusively by his family and with respect to which Mr. Farmer did not have an ownership interest. The log house was on property adjacent to the farm property owned jointly by the two families. At that time, Mr. Farmer also lived in a house on a parcel of property adjacent to the jointly owned farm property but owned solely by his family.

A barn and another building referenced as a "loafing shed" are located on the jointly owned property. Attached to the barn is a separate room to which Mr. Farmer referred as the "milk parlor," that being the area where cows were milked prior to 1964 when the family was still in the dairy business. Since then, the "milk parlor" has functioned as a storage room. (Transcript at 8–9.) The room was normally kept locked, and both families had a key to the padlock on the door.

Mr. Farmer testified that, on the morning of November 22, 2003 sometime between 10:00 a.m. and noon, he went to the barn, specifically to the milk parlor, to look for an appliance dolly normally stored there. Although he lived in a house on property adjacent to the property on which the barn and milk parlor were located, he had not been to the barn in approximately three months. (Transcript at 10.) On that day, he discovered that the padlock had been changed, and the key he had for it did not work. "[J]ust on a whim," Mr. Farmer went around to try the other door, which was usually bolted from the inside. (Transcript at 9.) To his surprise, Mr. Farmer found that door unlocked. He went inside and discovered that all the equipment normally stored in the milk parlor had been moved out, and the appliance dolly was not there either. He also noticed that the windows had been painted black. One corner of the room was partitioned off with "four by eight sheets of fire proof type material, asbestos material from the floor to the ceiling." (Transcript at 10.) He also found a large workbench covered with "asbestos type sheets"; the walls had a "yellowish tinge," and on another table was a large gallon jug with some kind of liquid in it." (Transcript at 10.) Mr. Farmer allegedly was surprised to see these items and had not previously been aware that the padlock had been changed. (Id.)

Mr. Farmer was suspicious that the items found in the milk parlor were consistent with its usage as a methamphetamine lab. He walked back to his home and immediately called his son, Eddie Farmer, who

2

was a colonel in the Sheriff's Department for Rutherford County. (Transcript at 15–16.) Mr. Farmer testified that he arrived home and called the Sheriff's Department by about noon that day. (Transcript at 15.) Later that afternoon, Eddie Farmer and another officer from the Sheriff's Department came to Mr. Farmer's house to discuss with him what he had seen. At that time, Mr. Farmer executed a consent form authorizing the Sheriff's Department to conduct a search of the farm buildings and structures located on the jointly owned property. (Pl.'s Exhibit 2.) The consent purportedly applied to "Farm Buildings and structures, on property off Hwy 99, Murfreesboro, TN 37128." (Pl.'s Ex. 2.)

Mr. Farmer testified that he had been away on a fishing trip in Florida during the early fall of 2003, returning around the first of October. After he returned, his suspicions about something untoward occurring in the barn were aroused because he saw a substantial number of vehicles coming and going at night. He believed he may have discussed this topic with his son Eddie. Mr. Farmer also knew at that time that Defendant had a history of drug abuse. Mr. Farmer testified that he went to the barn for the purpose of finding the appliance dolly so he could move a refrigerator from an apartment building that he owned, but he could not say for sure whether Eddie Farmer had previously suggested to him that he walk around the barn and other farm buildings to confirm his suspicions about drug trafficking going on over there. "He may have asked me to see if there were any – if I stumbled up on anything." (Transcript at 25.) Mr. Farmer might also have discussed his suspicions with Officer Chuck Thomas sometime during the fall of 2003 prior to November 22. (Id.)

After he signed the consent-to-search form, Mr. Farmer had no further participation in the search. He was at home that evening when the search was conducted and saw a large number of police cars (a "convoy" (Transcript at 27)) drive onto the property.

### B.    Testimony of Jason Mathis

Jason Mathis has been employed by the Rutherford County Sheriff's Department for seven and a half years, and assigned to the Narcotics Division for the past two years. He participated in the search that was conducted on the evening of November 22, 2003. He had been aware of the property prior to that day, however, because the Sheriff's Department "had had several informant and citizen complaints on the property of probable narcotics trafficking." (Transcript at 29–30.)

Detective Mathis was provided with a copy of the consent form signed by Mr. Farmer, and he was

3

present along with other deputies and officers at a pre-search meeting on November 22, 2003. According to Mr. Mathis, they were made aware of the fact that there were several buildings on the property, including the log house in which Defendant resided, that were not covered by the consent form. However, Mathis also testified that he believed the entire farm parcel, the farm buildings as well as the residential buildings occupied by Defendant and his mother, were jointly owned by Defendant, his mother, and Thomas Sterling Farmer, Sr. (Transcript at 70.)

After the pre-search meeting, Detective Mathis went with a number of other Sheriff's Department officers and deputies to the Farmer property. Detective Mathis and his "team" from the Narcotics Division (Transcript at 67) went first to "the large red barn" located on the property and in which they had reason to believe a meth lab had been set up. (Transcript at 31.) According to Detective Mathis, the area at the back of the barn that had been identified as the "milk parlor" appeared to have been operated as a meth lab. (Transcript at 32.) He and his team members instantly identified it as a meth lab, "deemed it to be hazardous and immediately exited after securing it." (Id.)[1] In addition to searching the milk parlor, they did a "complete security search of the building." (Transcript at 33.) Mathis later testified that "other members of [his] unit" searched the other buildings on the farm besides the barn and the milk parlor and found additional equipment that appeared to be consistent with use in a methamphetamine lab. (Transcript at 40.)

According to Detective Mathis, the Defendant was not in the barn at the time the search was conducted and he personally did not look for him nor ask others to look for him. (Transcript at 33–34.) He did, however, have occasion to speak with the Defendant that evening. As Detective Mathis described it, he first saw Defendant when Defendant "was brought outside by possibly a uniformed deputy." (Transcript at 34.) Detective Mathis was the "investigator" on the case and it was assigned to him at this point, so he talked to Defendant while walking with him back into Defendant's residence, the log house. (Id.) Defendant was handcuffed with his hands behind his back when Detective Mathis first came into contact with him. (Id.)

Mathis testified that after he and Defendant went inside the house, Mathis began questioning Defendant. First, however, he asked another officer to take the handcuffs off and re-cuff Defendant with his hands in front of him; then he asked Defendant to sit in a chair in the living room/den area of his house.

---

[1] Mathis testified later that the Sheriff's Department contacted the DEA, who sent agents out from Nashville to evaluate the scene. (Transcript at 42.)

4

(Transcript at 35.)  Mathis later specified that he moved the cuffs to the front because he knew Defendant could not sign a consent form with his hands behind his back.  (Transcript at 64.)  Detective Mathis further testified that, "to the [b]est of [his] recollection," he told Defendant the police were on the property and "had found some illegal things," and that the police were "conducting an investigation and would like consent to search [Defendant's] residence."  (Transcript at 35.)  Detective Mathis allegedly explained the consent form, explained the consent procedure, and then asked Defendant to read and sign the consent form.  (Id.)  Detective Mathis stated he did not "recollect anything [Defendant] told [him] after that," but Defendant signed the consent form in Mathis's presence.  (Transcript at 36, 37; Pl.'s Ex. 3.)  Detective Kevin Elrod witnessed the signature.  (Transcript at 38.)  The form was signed around 9:31 p.m.  (Pl.'s Ex. 3.)

Detective Mathis testified that he believed he read Defendant his Miranda rights at some point during the interview, and that normally he would read rights before conducting an interview or asking for Defendant's signature on the consent form.

After Defendant signed the consent form, Mathis and some other officers conducted a search of Defendant's house.  They found two small marijuana roaches; a glass pipe; a set of digital scales; a homemade metal smoking device; a plastic bag with white powder residue in it; three aluminum foil sheets with residue on them; a plastic bag with coffee filters in it; a tin bowl with a green leafy substance in it believed to be marijuana; six boxes of matches; some more coffee filters; 3 Lortab pills; a glass smoking pipe; and a pair of hemostats.  In addition, officers searched Defendant's clothing and retrieved a set of keys from a pants pocket, one of which was discovered to be the key to the padlock on the door to the milk parlor area of the barn.  (Transcript at 38–40.)

Detective Mathis testified that Defendant was later taken to the Sheriff's office and interviewed there.  During his interview, Defendant was cooperative, respectful, and calm.  (Transcript at 41.)  After he responded to the initial identifying questions (name, address, place of employment), Defendant's rights were read to him.  At that point, he advised the police that he wanted to have his attorney present before he made any further statement.  (Transcript at 41.)

On cross-examination, Mathis admitted that the search that occurred on November 22, 2003 was the culmination of an ongoing investigation of Defendant's possible involvement in drug activity occurring on the Farmer property.  The investigation had been going on for approximately six months, based upon

5

information that the Department had been receiving for a period of time from concerned citizens and informants. (Transcript at 43.) According to Mathis, the Sheriff's Department "had received complaints from anonymous sources there was drug use and drug trafficking going on out there," but to his knowledge those complaints had never been reduced to writing. (Transcript at 44.) One of the "concerned citizens" was Eddie Farmer, Detective Mathis's "boss," Thomas Sterling Farmer, Sr.'s son and Defendant's first cousin. (Transcript at 44.) Eddie Farmer also participated in the pre-search briefing that occurred the evening of November 22, 2003. (Id.)

Mathis stated he had the day off on November 22, but was called in around 6:30 p.m. to attend the briefing. He and "a few people" discussed the matter informally for a while. A formal briefing was held around 8:15 p.m. The Farmer property is located less than a mile from the Rutherford County Sheriff's Department. (Transcript at 46.) Colonel Eddie Farmer and Lieutenant Sharp conducted the briefing, and 24 other officers and deputies attended. (Transcript at 47.) There was a general discussion about the layout of the property, Defendant's criminal history, the possible presence of firearms. (Transcript at 47–48.)

Law enforcement arrived on the Farmer property around 8:45 p.m. Mathis was wearing plain clothes, and there were five to six men in his "immediate unit." (Transcript at 48–49.) His unit's assignment was to go to the location of the possible methamphetamine lab and to secure that area. (Transcript at 49.) He did not know whether another unit was assigned to go where the houses were, but if people were found on the property, "there were uniformed deputies to take charge of them if they posed any threat or anything." (Transcript at 49.)

Detective Mathis stated he was not aware of a "property line . . . dissecting this parcel of property," but at the same time, he did not believe he had consent to search everything on that property. (Transcript at 50.) He testified that they "were told specifically" that the "big white house" belonged to Defendant's mother and was not within the scope of the search, and that Defendant's log house likewise was outside the scope of Mr. Farmer's consent. (Id.) He was not aware, however, of whether any particular unit had the responsibility of going to Defendant's home or whether any decision was made about whether to confront Defendant that night. (Transcript at 53.) In response to questioning along those lines, Detective Mathis stated:

Best to my knowledge we were split into groups and given specific locations from the

6

blackboard which way to go. That was our area to secure, secure any people that were a threat, or hazardous areas, to the best of our ability.

At that point it was discussed that once we had the property searched and everything taken care of, any people or places secured, a determination [about whether to confront Defendant] would be made after that.

(Transcript at 54.)

Although 26 law enforcement agents participated in the raid, Detective Mathis could not state what the other agents were assigned to do that night. (See Transcript at 68, 72–73.) In his seven and a half years with the Rutherford County Sheriff's Department, Mathis had never participated in a raid involving that many law enforcement agents. (Transcript at 71–72.) Mathis could not specifically state that none of the agents was detailed to confront Defendant; he could only state that those were not his initial instructions. (Transcript at 73.)

Detective Mathis also could not state whether there was a "plan" to bring Defendant down to the barn or loafing shed. He was not clear about whether he knew that Defendant had been taken down to the loafing shed, but knew that Defendant had been taken outside, since that was where he was when Mathis first came into contact with him. (Transcript at 55–56.) Mathis also recalled that Defendant requested to use the bathroom before he executed the consent to search form. (Transcript at 56.) Mathis denied the implication that Defendant was required to execute the consent form before he was permitted to use the bathroom, but agreed there was a discussion about the need to search the bathroom before they could let Defendant go in. Mathis also believed Defendant had already executed the search form before he asked to use the bathroom, but then asked to use the bathroom before they got started on the search. (Transcript at 57.) Defendant was permitted to use the bathroom, but Mathis sent a uniformed deputy into the bathroom with him. (Id.)

When asked why they did not conduct the search of the barn, shut down the lab and drive off, given that they knew that Defendant's log house was not within the scope of the consent executed by Mr. Farmer, Detective Mathis stated only, "I don't know." (Transcript at 59.) Although he testified earlier that he was in charge of the investigation, he did not know who had made the decision to go over to the log house and Defendant's mother's house. (Id.) He stated that Lieutenant Bill Sharpe was "in charge" of the raid. (Transcript at 59–60), but he did not recall who told him to go confront Defendant at his house. (Transcript at 60.)

### C. Testimony of Kevin Elrod

Kevin Elrod is no longer employed by the Rutherford County Sheriff's Department, but he was employed in the Narcotics Division of the Rutherford County Sheriff's Department on the night of November 22, 2003 and participated in the search of the Farmer property. (Transcript at 75, 82.)

Elrod first went down to the property around dark for the purpose of surveilling the area to see if there was any activity occurring on the premises. He was sent there by Lieutenant Bill Sharp. (Transcript at 76.) He noticed a light was on but did not see any activity going on near the barn. (Transcript at 77.) He was down by the riverbank and noticed that water kept splashing near him even when he moved. He believed this was gunfire from a gun with a silencer wielded by someone on the opposite side of the river. (Transcript at 78.) Mr. Elrod never actually heard any gunshots (Transcript at 80), and there was no implication that Defendant had any connection with this possible gunfire (Transcript at 85).

Elrod went back to the Farmer property with the other agents later the same evening to participate in the search. He was assigned to the "shed area" and did not go to the barn. He believed he was assigned to secure the outer perimeter "or something of that nature." (Transcript at 80.) He was initially with Detective Goodwin and later with Detective Mathis. (Transcript at 87.)

Elrod also went to the log house. When he got there, Detective Mathis, Deputy Hammond, and Defendant were all inside already. (Transcript at 80–81.) Elrod was in the house when Defendant was presented with and signed the consent form; Elrod witnessed Defendant's signature. (Transcript at 81.) He agreed the consent was executed at 9:31 p.m. (Transcript at 88.)

On cross-examination, Elrod stated he did not receive any instructions during the pre-raid briefing about making contact with Defendant or his mother, and he did not recall any discussion during the briefing about "what was to be done with these people that lived on the property." (Transcript at 87.) He could not recall one way or the other whether the matter was discussed at all. (Transcript at 88.)

Elrod testified that when he saw Defendant, he was dressed in shorts but no shirt. (Transcript at 88.)

Elrod did not recall if Defendant was advised of his Miranda rights that evening. (Transcript at 89.) He did recall whether the consent form was explained to Defendant before he signed it.

Elrod did not recall who told him to go up to the log cabin. (Transcript at 90.)

Elrod recalled that Defendant requested to go to the bathroom and that another officer was detailed

to go in the bathroom or stand at the door when he went. (Transcript at 90–91.)

### D. Testimony of Chris Kaufman

At the time of the hearing Chris Kaufman had been employed by the Rutherford County Sheriff's Department approximately eight years. He is a sergeant with the Patrol Division, and also held that position in November 2003. Sergeant Kaufman participated in the pre-raid briefing at the Sheriff's Department and in the search of the Farmer property conducted on the evening of November 22, 2003. (Transcript at 92.)

Kaufman had been on the Farmer property previously, back in 1998 when he responded to a "shots-fired" call. (Transcript at 94.) The investigation at that time revealed that Defendant had shot a pistol in the direction of his "soon to be ex-wife" who lived in a house behind the log house. (Id.) Kaufman subsequently arrested Defendant for aggravated assault with a firearm. (Transcript at 95.) At the time of Defendant's arrest in 1998, law enforcement officers located a 9 millimeter Luger inside his house. (Id.) This incident was discussed during the pre-raid briefing that occurred the evening of November 22, 2003. (Transcript at 95–96.)

When he arrived on the Farmer premises, Sergeant Kaufman went first to a structure to which he referred as the maintenance shed. He stayed in front of the maintenance shed but did not participate in the search of the shed. His assignment was to provide security. (Transcript at 92–93.)

At some point, Lieutenant Sharp directed Kaufman to look for Defendant. (Transcript at 94.) Kaufman detailed two deputies, Hammond and Ross, to see if they could locate Defendant. They subsequently advised Sergeant Kaufman that they could see Defendant through a window at the back of his house. He was lying on a bed apparently watching television. (Transcript at 93–94.) When he received this information, Sergeant Kaufman informed Lieutenants Sharp and Grissom that Hammond and Ross had spotted Defendant inside his house. (Transcript at 94.) At that point, Sergeant Kaufman along with Detectives Goodwin and Garner left the shed area to go up to Defendant's house to confront him. (Transcript at 97.)

The three officers went up to the front door of the log house. There was a glass storm door that was shut, while the interior door was open. (Transcript at 97.) According to Sergeant Kaufman, he knocked on the front door "a couple of times and announced Sheriff's office." (Id.) He also called out, "Sterling, we need to talk to you." (Id.) Kaufman stated he then opened the storm door without stepping inside and yelled,

9

"Sterling, this is the Sheriff's office."  (Id.)  At that point, Defendant appeared in the doorway to the living room and began walking toward the front door.  (Id.)  Kaufman testified:

> As he was walking toward me into the living room, he is probably eight feet away from us.
> I guess I told him that we need to come in and speak with him, that there was some narcotics investigators that needed to speak to him.  He said all right.
>       At that point, I made entry.  They [the other officers] followed me.

(Transcript at 97.)  Kaufman then asked Defendant to turn around and put his hands behind his back to be handcuffed.  According to Kaufman, Defendant "was being detained pending an investigation."  (Transcript at 98.)  Kaufman stated he handcuffed Defendant because of the prior incident involving a firearm in 1998 and Kaufman's knowledge that Defendant had a prior firearm charge.  Kaufman then handed Defendant over to the narcotics detectives.  He testified Defendant stayed in the house after that, but Kaufman left and did not return to the house.  Kaufman instead went to the shed and told Lieutenant Sharp that Defendant had been located and Detectives Garner and Goodwin were talking to him.  (Transcript at 98.)

Sergeant Kaufman also recalled that "the deputies" told him they had "observed a small boy run from the log cabin to a white farmhouse also located on the property."  (Transcript at 98.)  Kaufman himself did not recall seeing the child.  (Transcript at 99.)  He later testified that the deputies who first spotted Defendant in the back bedroom had also seen the child sitting on the floor watching television at the same time.  (Transcript at 104.)

On cross-examination, Sergeant Kaufman stated that he did not recall any discussion at the pre-raid briefing regarding what was to be done with Defendant or his mother, who lived on the property.  (Transcript at 100.)  They were made aware that Defendant and his mother were on the premises, but his understanding was that they would decide once out there whether to confront the Defendant.  (Transcript at 101.)  He sent Ross and Hammond up to look for Defendant because Lieutenant Sharp told him to do so.  (Transcript at 102.)

Kaufman stated he did not have his gun drawn when he went to Defendant's front door.  (Transcript at 103.)

Kaufman did not recall whether there was any discussion at the pre-raid briefing as to who owned what portion of the property being searched, but understood that Mr. Farmer co-owned the entire parcel with Defendant and Defendant's mother.  (Transcript at 105.)  He allegedly also understood, however, that the

log house in which Defendant resided was not within the scope of the consent to search form executed by Mr. Farmer. (Transcript at 105–06.)

### E. Testimony Of Todd Hammond

Deputy Todd Hammond has been employed by the Rutherford County Sheriff's Department in the Patrol Division for three and a half years. He participated in the search of the Farmer property on November 22, 2003. He was in the lead car when they arrived on the property and went directly to the barn. He was in uniform. Deputy Hammond did not participate in the search of the barn because his instructions were to provide security. (Transcript at 110.)

At some point he was told by Sergeant Kaufman to "continue to clear the area up toward [Defendant's] residence." He did not state that Kaufman told him to look for Defendant. He and another deputy approached the house from the rear. (Transcript at 111.) Once they arrived at the back side of Defendant's cabin, they could see the Defendant sitting up in bed watching television, and they relayed that information to Sergeant Kaufman. (Transcript at 111–12.)

They then walked around to the front of the house and met Sergeant Kaufman at the front door. Deputy Hammond was present when Sergeant Kaufman "knocked and announced" and called out to the Defendant by his first name from the screen door. (Transcript at 112.) Defendant appeared at the doorway to the living room moments later. (Transcript at 113.) According to Deputy Hammond, Sergeant Kaufman asked if they could come in and speak with Defendant; Deputy Hammond was "pretty sure" Defendant said "all right." (Transcript at 114.) At that point, Deputy Hammond followed Sergeant Kaufman into the house. Deputy Hammond stated that Sergeant Kaufman placed the Defendant in handcuffs and had him sit down in a chair right inside the front door. (Transcript at 115.)

On cross-examination, Deputy Hammond stated that when he saw Defendant sitting on the bed watching television in the back bedroom, he also saw Defendant's son sitting "Indian style" on the floor of the in front of the television. (Transcript at 116.)

Hammond stated he arrived on the Farmer property with the other law enforcement agents at about 8:45. He could not recall how long he was detailed to "perimeter security" before being sent up to the log cabin. (Transcript at 117.) It "wasn't very long." (Id.) When asked if it was ten or fifteen minutes, Hammond would not estimate, but simply repeated it was "a short time" (Transcript at 118), "not very long" (Transcript

11

at 119).

Hammond attended the pre-raid briefing. He too understood that the entire property was jointly owned by Defendant and his uncle Thomas Sterling Farmer, Sr. (Transcript at 119.)

Hammond did not recall Defendant ever leaving the log cabin after he and Sergeant Kaufman entered it up until being taken to the Sheriff's Office. (Transcript at 120–21.) Specifically, he did not recall that Defendant was taken from the house down to the loafing shed. (Transcript at 120–21.) Hammond was not at the house continuously after Defendant was initially detained (Transcript at 121), but he was present at the time Defendant signed the consent to search. (Transcript at 121.) Deputy Hammond remembered Defendant was wearing a pair of cut-off shorts and no shirt, and he recalled Defendant needing to go to the bathroom. (Transcript at 122.) Deputy Hammond was required to be present while Defendant used the bathroom. (Transcript at 122.)

Deputy Hammond remembered walking over to the house occupied by Nancy Farmer, Defendant's mother, but he did not remember speaking with her. (Transcript at 123.) He thought someone else did speak with her but did not remember who. (Id.)

Upon questioning by the Court, Deputy Hammond stated he was present when Detective Mathis came in, and that Defendant was in the house when Mathis arrived. (Transcript at 123.)

### F.     Testimony Of Daniel Goodwin

Daniel Goodwin no longer works for the Rutherford County Sheriff's Department, but was so employed in November 2003 and worked for the Sheriff's Department for approximately thirteen years. In November 2003, he was assigned to the Narcotics Division, and he participated in the search of the Farmer property on the evening of November 22, 2003. (Transcript at 125.) Mr. Goodwin was also present at the pre-raid briefing. (Transcript at 127.)

When Goodwin arrived on the premises, he went first to the barn where the main lab was reputed to be. He was "point man on that team." (Transcript at 127.) According to Goodwin, they went into the area where the lab equipment was reported to be, "saw it looked like methamphetamine and backed out." (Transcript at 128.) A few minutes later, they went over to a little structure "between that area and what everybody has been calling the workshop area down at the bottom of the hill below [Defendant's] cabin." (Transcript at 128.) Shortly after arriving there, Sergeant Kaufman received a radio communication from

12

Officer Hammond that he had seen "people" inside the log cabin. (Transcript at 128.) Sergeant Kaufman headed that direction. Lieutenant Sharp directed Detectives Garner and Goodwin to go with him. (Id.)

They went up to the front porch of the cabin. Sergeant Kaufman was there along with Deputy Hammond. The four of them were there when Kaufman knocked on the door. (Transcript at 129.) Kaufman "was yelling for [Defendant] by his first name, . . . saying, come on out. We need to talk to you." (Id.)

Defendant came into the room and "was stretching and stuff as if he was asleep." Goodwin testified that Kaufman said something like "we need to talk to you about what is going on," and Defendant said, "you all come in." (Transcript at 129.) Goodwin did not see Defendant being handcuffed. (Transcript at 130.) He also did not hear any Miranda warnings being read to Defendant, nor did he witness Defendant signing the consent form. (Transcript at 138.) Instead, upon entering the house, Detectives Garner and Goodwin "immediately went to check the rest of the house to see if there were more people present." He did not recall seeing any other people. (Transcript at 130.) After he "cleared the house," he left the house. (Transcript at 136.) He did not recall seeing Defendant's son in the house. (Transcript at 137.)

On cross-examination, Goodwin testified that he had been in the Narcotics Division for approximately five years at the time of the raid on the Farmer property. During that time frame, his division "had been told several times that [Defendant] might be operating a meth lab on his property." (Transcript at 131–32.) He also believed Lieutenant Sharp "had been surveilling the property for several weeks before this [raid] occurred." (Transcript at 132.) According to Goodwin, Sharp "just went out and watched [the property] and sometimes he had us go with him." (Id.)

It was Goodwin's understanding that the property was owned jointly by Defendant's father and Colonel Farmer's father. (Transcript at 133.) He was not sure if Defendant's father was dead, but he knew the property was jointly owned and that they had a signed consent to search from "Colonel Farmer's father." (Transcript at 134.) He did not recall any discussion during the briefing about what was to be done about the people living on the property who might be there during the search, including Defendant and his mother, Nancy Farmer. (Transcript at 134.) According to Mr. Goodwin, "[o]n consent searches usually if the people are present and have given us consent we go ahead and do the search and the people aren't necessarily cuffed or detained or anything else as long as they are consenting." (Transcript at 134–35.) During a warrant

13

search, however, the "usual procedure" is to "take people present and detain them." (Transcript at 134.) He implicitly agreed the situation was a little different where one co-owner consents but the other co-owner has not been consulted, but could only state that if any person had been located at the barn area he was detailed to search, that person would have been detained. He did not know who issued the order to go find Defendant and confront him. (Transcript at 135.) He was not aware that Defendant ever left the house after being initially detained by Sergeant Kaufman. (Transcript at 139.) He specifically did not recall the Defendant being down by the loafing shed. (Transcript at 140.)

Goodwin did speak to Defendant's mother, Nancy Farmer, on the evening of the raid. He could not recall whether it was before or after Defendant had been located in the log cabin. (Transcript at 139.)

### G.      Testimony of Alan Garner

Detective Alan Garner has been employed by the Rutherford County Sheriff's Department for ten and a half years. In November 2003 he was assigned to the Narcotics Division. He participated in the search of the Farmer property on the evening of November 22, 2003. He was with Mr. Goodwin, Sergeant Kaufman and Deputy Hammond when they entered Defendant's house. Detective Garner, like Mr. Goodwin, testified that Kaufman "knocked and announced," and, after Defendant appeared in the doorway to the living room, asked if they could come in and speak with him. Defendant responded, "okay. Come in." (Transcript at 143–44.) Detective Garner recalled that Defendant was handcuffed with his hands behind his back, though he did not know who placed the handcuffs. Immediately after arriving, he and Detective Goodwin performed a "safe sweep of the house" to ensure no other people were present. (Transcript at 144.) He did not recall seeing anyone else in the house. (Transcript at 145.)

On cross-examination, Detective Garner stated that he also ended up participating in the search of the log cabin a little later. (Transcript at 146.) Garner did not recall that Defendant ever left his house after his initial detention until he was taken to the Sheriff's Department. (Transcript at 146.) He did recall Defendant stating he needed to go to the bathroom just before they searched the house. After they conducted the search, Detective Garner went outside and walked back down to the barn. (Transcript at 147.)

### H.      Defendant's Testimony

Defendant Thomas Sterling Farmer, Jr. testified at the hearing. Defendant testified that he has lived on the property that was the subject of the search on November 22, 2003 "off and on all [his] life," and

14

continuously for the past seven or eight years. (Transcript at 149.) As described by the Defendant, the farm consists of approximately 41 acres, 5.2 acres of which belong solely to Defendant's family (the "home portion") and thirty-six acres of which are jointly owned by his family and his uncle. (Transcript at 149–54 and Def.'s Exs. 1-4.)

In the fall of 2003, Defendant and his mother lived on the home portion of the farm. Defendant's friend Jerry Lokey, also a defendant in this case, was "staying with [Defendant] some." (Transcript at 155.) Defendant was home in the log house located on the home portion of the property on the evening of November 22, 2003. (Transcript at 157.) He was asleep on the bed in the back bedroom when his nine-year-old son woke him up saying, "dad, somebody is here." (Transcript at 158.) When his son woke him up, he heard voices announcing Sheriff's Department, so he started toward the front of the house. (Transcript at 158.)

Defendant made it to the hallway that ran behind the living room (see Pl.'s Ex. 4), at which point he saw Sergeant Kaufman at the other end of the hallway. (Transcript at 159.) They were facing each other from opposite ends of the hallway. (Transcript at 161.) Kaufman told him "they" needed to talk to him about something going on down at the barn. (Transcript at 161.) Kaufman put handcuffs on him, stating he was doing so for Defendant's own protection. (Transcript at 159.) Defendant specifically denied that he went to the door and invited the officers inside. (Transcript at 161.) According to Defendant, when his son woke him up, the officers were already in the house. (Transcript at 161–62.)

After he was hand-cuffed, Defendant was seated in the living room area "just briefly." A call came in on the radio for the officers to take Defendant down to the loafing shed. (Transcript at 159.) He was wearing only shorts at the time, but the officers did allow him to put on shoes and socks before they moved him out of the house and down to the loafing shed. (Transcript at 163.) The temperature was "probably in the forties," according to Defendant. (Transcript at 164.)

Once taken down to the loafing shed, the Defendant stood around there for twelve or fifteen minutes. (Transcript at 164.) Several officers were standing around with him. (Transcript at 165.) He could see other officers basically spread out all over the property. (Transcript at 165.)

After that ten or fifteen minute period of standing at the loafing shed, Defendant was moved to the back seat of a marked patrol car that was stationed between the loafing shed and the barn. (Transcript at

166.) His hands were still cuffed behind his back. (Transcript at 166–67.) Defendant guessed he was in the car for another ten to fifteen minutes. During this time period, he began to experience discomfort resulting from an urgent need to go to the bathroom. (Transcript at 167.) He told one of the officers of his discomfort. The officer disappeared for a minute or two and returned to escort Defendant back up to the house. The officer pulled the patrol car around in front of the maintenance shed and from there they walked up to the log cabin. (Transcript at 168.) As they reached the log cabin, Detective Jason Mathis and several other officers met them there. (Transcript at 168.)

Defendant testified that Detective Mathis told him he would have to search the bathroom before he could let Defendant go in there, and Defendant would first need to sign the consent-to-search form. Defendant claimed that at this point, he desperately needed to go to the bathroom. (Transcript at 168.) Defendant signed the consent form. (Transcript at 169.) Defendant stated that, at that point, he "would have signed anything." (Transcript a t169.) He did not read the form before signing it nor was it explained to him other than that if he needed to go to the bathroom, he would need to sign the form so the officers could first search the bathroom. In his mind, there was a clear connection between his ability to use the bathroom and the need to sign the form. (Transcript at 170.) After he signed the form, the officers searched the bathroom and he was allowed to go in and tend to business. (Transcript at 170.) The handcuffs were removed and replaced with his hands in front of him so he could sign the form, and he remained cuffed while using the bathroom. (Transcript at 171.) Officer Hammond was assigned to stand at the bathroom door and watch him. (Transcript at 171.)

Defendant agreed that the time indicated on the consent form, 9:31, was probably accurate. (Transcript at 170.) At that point, approximately 30 minutes had passed since he had been awakened by his son telling him somebody was at the house. (Transcript at 170–71.)

After using the bathroom, Defendant was brought back into the living room. He complained of being cold and someone brought him a t-shirt. He was allowed to take the cuffs off long enough to pull the t-shirt over his head. (Transcript at 172.) He was re-cuffed with his hands behind his back. Shortly after that, he was escorted back to the patrol car and then driven to the Sheriff's Department. (Transcript at 172.)

Defendant further testified that at no time prior to being transported to the Sheriff's Department was he read his Miranda rights. (Transcript at 172.) He was questioned while still at his house, but only briefly.

16

Detective Mathis asked him if there was "anything" in the house. (Transcript at 173.) Defendant said no. At that point, Mathis "got specific." (Transcript at 173.) He asked whether there were any guns, and Defendant said no. He asked if there were any drugs, and Defendant said no. He asked if there was "anything else," to which Defendant responded, "like what?" Mathis said, "like paraphernalia," and Defendant said, "yes, there is." (Transcript at 173.) Defendant then directed him to where there was some drug paraphernalia in the cabinet over the refrigerator. (Transcript at 174.) After that, Defendant was escorted out of the house and taken to the Sheriff's Department.

Once he was at the Sheriff's Department, he was initially placed in a holding cell. He was booked sometime later, and at that point he was read his Miranda rights for the first time. (Transcript at 175.)

On cross-examination, Defendant clarified that he believed it was Detective Kaufman who took him from the house to the loafing shed. Detectives Goodwin and Garner were also down there, along with other officers, both uniformed and in plain clothes. (Transcript at 176–77.) Defendant was not sure of the identity of the officer who placed him in the patrol car or who brought him back up to the house. He only recalled that the officer was wearing a uniform. (Transcript at 177.)

Defendant reiterated that he was asleep on the bed in the back bedroom when the officers arrived at his house. (Transcript at 181.) His son was on the floor in the same room watching television. He never saw his son leave the house, so was not sure when or how he left. (Transcript at 181.) He did recall Sergeant Kaufman asking him if there was anyone else in the house, and Defendant told him his son was there. (Transcript at 181.) Defendant stated he was under the impression, though he did not actually witness it, that the officers later escorted his son over to Defendant's mother's house.

The Defendant was also examined extensively on what he believed to be the scope of the consent to search that he signed. Defendant maintained that he was focused on the fact that he needed to go to the bathroom, and he gave very little thought to the question of whether the consent authorized the agents to search the entire house rather than just the bathroom. (Transcript at 188–90.) Defendant agreed that he answered questions put to him by Detective Mathis while at his house, but requested an attorney be present when Mathis wanted to question him at the Sheriff's Department. (Transcript at 191.) Defendant stated that he was "a cooperative-type person," but the difference was that his cousin, Eddie Farmer, was present when they took him to the Sheriff's Department, and he felt he needed to be cautious because of the bad blood

between him and his cousin and the way things had gone at the time of his earlier arrest. (Transcript at 191–92.) Defendant also admitted he never objected to the search of his house, even though he thought he was just consenting to the search of his bathroom. (Transcript at 193–94.)

## II.    FINDINGS OF FACT

The Court is frankly troubled by certain discrepancies in the testimony offered by the law enforcement officers of the Rutherford County Sheriff's Department. In particular, Detective Mathis testified specifically that he met Defendant outside of Defendant's log house, which is consistent with Defendant's testimony regarding being taken to the loafing shed, while none of the other officers recalls that Defendant was removed from his house for nearly thirty minutes. In addition, none of the officers really remembered seeing Defendant's little boy. Garner and Goodwin specifically did not recall seeing the little boy, though they allegedly performed a security sweep of the entire house immediately after they entered and first came into contact with Defendant. Garner participated in the more thorough search that allegedly occurred shortly thereafter. Clearly, if the security sweep and the search happened immediately after the officers' entry into the house, someone should have seen the boy. Further, while all of the officers testified that only a very short period of time passed between their rapid confirmation that the milk parlor was being used as a meth lab and their going to Defendant's cabin, no one could explain how forty-five minutes passed between the time the officers arrived on the property and the time Defendant signed the consent-to-search form.

It is also troubling that all the officers who testified appeared to believe that all the Farmer property was jointly owned by Thomas Sterling Farmer, Sr. and Defendant, though they claimed also to understand that Defendant's home was not within the scope of the consent to search executed by Mr. Farmer.

Based upon the demeanor of the Defendant and the vagueness of the law enforcement officers' testimony, the Court credits Defendant's testimony in the following particulars: (1) that Sergeant Kaufman entered Defendant's house without first obtaining permission; (2) that Defendant was taken to the loafing shed on a chilly November night wearing only a pair of shorts; (3) that Defendant requested to go back to his house because he needed to go to the bathroom; (4) that Defendant met with Detective Mathis outside his house on his way back for that purpose; (5) that Defendant was essentially required to sign the consent form before being permitted to use the bathroom; and (6) that Defendant's Miranda rights were not read to him until after he was taken to the Sheriff's Department.

18

III.     **CONCLUSIONS OF LAW**

The United States argues that Defendant effectively consented both to the entry and search of his home.  Alternatively, the United States argues that exigent circumstances justified the entry and search, regardless of whether valid consent was given.

### A.      *Whether Defendant Effectively Consented to the Entry or Search of His Home*

There is no dispute that consent to entry or a search obviates the need for a search warrant.  See Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) ("The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or search for specific objects.  The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises.") (internal citations omitted); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirement of both a warrant and probable cause is a search that is conducted pursuant to consent.").

The prosecutor who seeks to rely upon consent to justify the lawfulness of a search or entry has the burden of showing by a preponderance of the evidence, through "clear and positive testimony," that *valid* consent to the search was obtained.  United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996) (citations omitted); see also United States v. Carter, 378 F.3d 584, 587–88 (6th Cir. 2004) (applying the same standard to a warrantless entry as to warrantless search).  Whether consent was freely and voluntarily given is a fact question to be determined upon examination of all the attendant circumstances.  Carter, 378 F.3d at 587.  Because a person has a greater expectation of privacy in his home than elsewhere, courts must closely scrutinize any warrantless entry into or search of a residence, and "carefully examine any purported consent for signs of coercion or duress."  United States v. Hardeman, 36 F. Supp. 2d 770, 778 (E.D. Mich. 1999) (finding as factual matter that defendant had not consented to warrantless entry into his home).  Consent obtained through deceit, menace, or coercion is not free and voluntary.  United States v. Gamez, 389 F. Supp. 2d 975, 980 (S.D. Ohio 2005).  Each determination of whether valid consent was obtained is "fact-specific," and the trial court, of course, is given wide latitude to assess the credibility of witnesses.  United States v. Moore, 130 Fed. Appx. 728, 735–36 (6th Cir. 2005).

As indicated above, the Court finds that Defendant did not effectively consent to the entry into his

19

house, as the officers were already inside his house before Defendant made it to the front door.  Likewise with respect to the consent to search, the Court finds that Defendant's consent was not effective.  Rather, he was  effectively coerced as a result of the fact that he desperately needed to go to the bathroom by the time the consent form was presented to him.  Moreover, the fact that the warrantless entry was not validated by consent automatically renders suspect the subsequent search.  Cf. Chambers, 395 F.3d at 569 ("When an individual consents to a search after an illegal entry is made, the consent is not valid and 'suppression is required of any items seized during the search.' ") (quoting United States v. Buchanan, 904 F.2d 349, 356 (6th Cir. 1990)).

In sum, the Court finds that the Defendant did not give valid consent either to the entry or the search.  The next issue, then, is whether exigent circumstances justified the entry and search.

### B.  Whether Exigent Circumstances Justified the Warrantless Entry or Search

By explicitly stating, "The right of the people to be secure in their . . . houses . . . shall not be violated," U.S. Const. amend. IV, the Fourth Amendment has "drawn a firm line at the entrance to the house.  Absent exigent circumstances [or consent], that threshold may not be reasonably crossed without a warrant."  Payton v. New York, 445 U.S. 573, 590 (1980).  "Warrantless seizures are per se unreasonable under the fourth amendment, except in a few carefully delineated instances."  United States v. Radka, 904 F.2d 357, 360 (6th Circ. 1990).  One of those "carefully delineated instances" is the "exigent circumstances exception," which "relies on the premise that the existence of any emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant."  Id.  Exigent circumstances are to be narrowly construed when they are sought to be applied to residential premises.  United States v. Nelson, 459 F.2d 884, 887 (6th Cir. 1972).  Because warrantless home entries are presumptively unreasonable, "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness."  Welsh v. Wisconsin, 466 U.S. 740, 750 (1984); accord United States v. Morgan, 743 F.2d 1158, 1162 (6th Cir. 1984).

### 1.  The Warrantless Entry

Exigency in the context of a warrantless entry has been recognized in a few narrow circumstances.  For instance, courts have consistently found exigent circumstances to exist when there is a reasonable belief that (1) destruction of evidence in imminent, (2) the suspect is going to flee, (3) the suspect poses a great

risk of danger to police or others so he needs to be quickly apprehended, and (4) police are in hot pursuit of a fleeing felon who enters a home. United States v. Rohrig, 98 F.3d 1506, 1515 (6th Cir. 1996); see also Radka, 904 F.2d at 362 (stating that a warrantless entry will be sustained on the basis of exigent circumstances if there is (1) a reasonable belief that someone is inside the dwelling; and (2) a reasonable belief that the loss or destruction of evidence is imminent); 5 Am. Jur. 2d Arrest § 122 "Exigent Circumstances" (2005):

> Factors indicating exigent circumstances include the gravity of the offense, reasonable belief that the suspect is armed, probable cause to believe that the suspect actually committed the felony, strong reason to believe that the suspect is on the premises being entered, likelihood that delay could cause the destruction of evidence or jeopardize the safety of the officers, likelihood that the suspect will escape if not swiftly arrested, the peaceable circumstances of the entry, whether the offense was recently committed, and whether there was any deliberate or unjustifiable delay during which a warrant could have been obtained. The mere presence of weapons or destructible evidence alone does not create exigent circumstances, nor are exigent circumstances established solely by the gravity of the offense. The presence of exigent circumstances sufficient to permit lawful warrantless arrest in a dwelling is decided on a case-by-case basis, and no single factor or group of factors is determinative.

(Footnotes omitted.)

In light of this standard, the Court concludes that no exigent circumstance existed to justify a warrantless and non-consensual entry in this case. The United States maintains that the police knew of Defendant's violent reputation, and in its brief argued that Defendant would likely destroy or conceal evidence "since he was alerted to the search and gathering of evidence that was going on in the barn and shed nearby." (Doc. No. 48, at 5.) The evidence at the hearing established, however, that the Defendant was not aware that the law enforcement agents were on his property until they began pounding on his door. Moreover, the United States does not explain why the police could not have simply secured the surrounding area and waited for a warrant if Defendant refused to permit them to enter. Further, the object of the search was a methamphetamine lab, not merely possession of illegal substances. Most of the reported "exigent circumstances" cases involve illegal substances themselves, which are easily disposed of by flushing them down the toilet or otherwise. Cf. United States v. Chambers, 395 F.3d 563, 568 (6th Cir. 2005) (Merritt, J.) (affirming trial court's granting of motion to suppress based on the absence of exigent circumstances or effective consent, noting that the government failed to explain "[w]hy and how exactly the officers thought the occupants were going to destroy an entire operating meth laboratory").

Finally, and most damagingly, the United States does not explain why a warrant was not obtained

prior to the officers' raid on the Farmer property in the first place. Clearly, they had evidence from several sources that Defendant was involved in the manufacture of methamphetamine, and when they searched the barn, they found exactly what they were looking for. "Where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it," Coolidge v. New Hampshire, 403 U.S. 443, 470 (1971), there is a strong presumption that a warrant could have been obtained in advance. The Government asserts that "[t]he entry and detention of the defendant was not a planned occurrence but the result of an ongoing field investigation." (Doc. No. 48, at 6.) The fact is the Rutherford County Sheriff's Department *should* have planned ahead of time how to deal with Defendant since its agents knew exactly what they would find in the farm buildings and further knew Defendant would likely be in his home adjacent to the area the intended to search. Their failure to plan does not create an exigent circumstance.

In short, the United States has not demonstrated that any exigent circumstances existed to justify the law enforcement officers' entry into Defendant's home without his permission.

### 2. The Warrantless Search

As the Sixth Circuit has recently reiterated, the principles governing warrantless searches based on "exigent circumstances" are fairly well settled. Under the Fourth Amendment, the most important principle is that searches must ordinarily be cleared in advance as a part of the judicial process—that is, by obtaining a search warrant. Chambers, 395 F.3d at 565. In Coolidge, the Supreme Court explained:

> [T]he most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative. [T]he burden is on those seeking the exemption to show the need for it.

403 U.S. at 454–55 (internal quotation marks, citations and footnotes omitted). In order for a warrantless search to pass muster, probable cause must exist, but "no amount of probable cause can justify a warrantless seizure" because, in addition, the cause of the search must be based on an "emergency" and hence, "inadvertent" or unanticipated. Chambers, 395 F.3d at 565 (quoting Coolidge, 403 U.S. at 471).

Thus, under these principles, officers are required to seek a warrant based on probable cause when they believe in advance they will find contraband or evidence of a crime. They must articulate the basis of their belief in the affidavit and bring the matter before a magistrate. When the police go to a home with the

intention of searching for evidence, they may not forgo a warrant. <u>Chambers</u>, 395 F.3d at 565. When there is neither a warrant nor consent, courts will only permit a search or seizure to stand under extraordinary circumstances. <u>Id.</u> "Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police." <u>Id.</u> (quoting <u>McDonald v. United States</u>, 335 U.S. 451, 455(1948)).

Moreover, for a warrantless search to stand, law enforcement officers must be responding to an *unanticipated* exigency rather than simply creating the exigency for themselves. <u>Id.</u> Exigency in the context of a warrantless search has been defined in the Sixth Circuit as "a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." <u>Morgan</u>, 743 F.2d at 1162 (citations omitted). In order for exigent circumstances to justify a warrantless search, the situation must be one where real immediate and serious consequences will certainly occur if a police officer postpones action to obtain a warrant." <u>United States v. Williams</u>, 354 F.3d 497, 503 (6th Cir. 2003) (internal quotation marks and citations omitted).

In the case at bar, the United States claims that exigent circumstances were present in that (1) risk of danger existed and (2) there was a reasonable belief that the defendant might destroy or conceal evidence. More specifically, the United States claims the police were aware of a risk of danger because the deputy who first entered the house had been there before and was aware of Defendant's history of violence. Thus, the United States argues, it was reasonable to take immediate action to restrain Defendant in light of that history and reputation for violence, in light of the investigation going on around him at the time. In other words, the United States does not address the issue of whether exigent circumstances existed to justify the search, apart from the entry and detention. Assuming that the entry was proper, the government cannot explain why they could not wait for the issuance of a search warrant before proceeding with the search. Obviously, the Defendant was not going anywhere at that point, since he was handcuffed and effectively in police custody. Thus, it appears that there were no exigent circumstances to justify the search either

**CONCLUSION**

The Court finds that Defendant did not consent to the entry into his house and that his consent to the search was invalid both because it was apparently coerced and because it was tainted by the prior warrantless entry. Further, no exigent circumstances were present to justify either the entry or the search. Consequently, Defendant's motion must be granted, and the fruits of the warrantless entry and search must

23

be suppressed.

        An appropriate Order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge